```
                            87M7HOTC (2)
                                                                    1
     87M7HOTC
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   HOT STITCH LLC,
 3
 4              Plaintiff,
 4
 5         v.                              08 Civ. 6296
 5
 6   ASHLEY STEWART LTD,
 6   URBAN BRANDS, INC.
 7   and ETHAN SHAPRIO,
 7
 8              Defendants.
 8
 9   ------------------------------x
 9
10                                         July 22, 2008
10                                         10:00 a.m.
11
11   Before:
12
12                    HON. GEORGE B. DANIELS
13
13                                         District Judge
14
14                         APPEARANCES
15
15   BALLON STOLL BADER & NADLER
16        Attorneys for Plaintiff
16   BY:  VANO I. HAROUTUNIAN
17
17   MATTHEW WOJTKOWIAK
18   BRANDON WHITE
18        Attorneys for Defendants
19
19
20
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    2
     87M7HOTC
 1         (Case called)
 2         (In open court)
 3         MR. HAROUTUNIAN:  Good morning, your Honor, Vano
 4   Haroutunian with Ballon Stoll Bader & Nadler, appearing on
 5   behalf of plaintiff Hot Stitch LLC.
 6         THE COURT:  Good morning, Mr. Haroutunian.
 7         MR. WOJTKOWIAK:  Good morning, your Honor.  Matthew
 8   Wojtkowiak from Fensterstock & Partners.  With me is Brandon
 9   White from the firm Foley Hoag, representing defendants Ashley
10   Stewart Ltd., Urban Brands, Inc. and Ethan Shapiro.
11         THE COURT:  Good morning.
12         MR. WHITE:  Good morning, your Honor.  My motion for
```

```
                           87M7HOTC  (2)
13      admission pro hac vice has been assented to and submitted.
14               THE COURT:  OK.  Did you send me a copy, or did you
15      just file it ECF?
16               MR. WOJTKOWIAK:  Your Honor should have a copy of the
17      papers.  They were handed up this morning before we commenced.
18               THE COURT:  Let me turn to Mr. Haroutunian.  What is
19      the status at this point?  I see we have the defendants
20      represented now.  What is the status from your perspective, and
21      what are you going to do?
22               MR. HAROUTUNIAN:  Your Honor, from our perspective I
23      was served this morning in the last few minutes with opposition
24      papers from the defendants.  I read them.
25               The court will find that there is broad agreement as
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                  (212) 805-0300
```

                                                                              3
```
        87M7HOTC
 1      to the facts of what happened.  With obviously a bit of a
 2      disagreement as to the characterization of some the events that
 3      took place, we have different perspectives, however, there is
 4      very little disagreement on the fundamental points.
 5               Those points are that an order were given, those
 6      points are that when the goods arrived here the defendant was
 7      unable to obtain credit approval with the plaintiff's factor,
 8      and that the plaintiff decided to make a decision to ship the
 9      goods on a $200,000 increments of credit.
10               Now defendants are saying, well, by doing so the
11      plaintiff took a risk in not being able to sell all of the
12      goods.  The defendants are saying we never told them to ship us
13      in $200,000 increments, he could have shipped the whole thing.
14      No disagreement with the facts.  That's exactly what happened.
15               My client made a decision it was going to take a risk
16      up to $200,000, then increased that to $300,000.  There is no
17      disagreement that he was always paid on time before these last
18      invoices.  It's in our own papers that it was always paid on
19      time beforehand.
20               There is no disagreement that the defendant said go
21      ahead and ship the whole thing, we will accept it, we need
22      those goods.  The problem was the defendant didn't have credit,
23      and my client with a limited capitalization was not willing to
24      take the risk of shipping a million dollars or $800,000 of
25      goods.  He told them I will ship it to you in increments, you
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                  (212) 805-0300
```

                                                                              4
```
        87M7HOTC
 1      pay me and I will ship; you pay me and I'll ship.  No
 2      disagreement with that.
 3               There is a disagreement as to whether this arrangement
 4      of getting the goods to come to the United States and then
 5      trying to obtain the credit approval, whether that was the
 6      standard way that the parties worked with each other.  My
 7      client maintains that although he did agree to do it in this
 8      particular instance with Ashley Stewart, he did not know at the
 9      time that he was agreeing that there was not going to be credit
10      approval when the goods arrived to the United States.
11               THE COURT:  Agreeing to what?
12               MR. HAROUTUNIAN:  My client said that the standard in
13      practice in the industry is that when you got a purchase order,
14      the customer gives you a purchase order, $800,000, then the
15      standard is for you to clear the credit with your own factor,
16      with the guarantor and then to put the goods in work.
17               In this instance Ashley Stewart said we don't want you
```

```
                          87M7HOTC (2)
18      to do that, we don't want you tying up our credit lines, go
19      ahead, you know, we've worked together already, we've never
20      been late in payments, go ahead, put the goods in production,
21      when they get here, before you ship to us, then obtain your
22      credit approval.  My client did agree to that, and when the
23      goods arrived here it was clear -- and there is an actual
24      admission in the defendant's paper that -- the defendant was
25      unable to secure that approval from the guarantor, mainly the
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

5

```
        87M7HOTC
1       factor.
2                THE COURT:  So, what immediate relief are you asking
3       for?  That's the first thing.  I don't want to get into the
4       total merits of this case.  You made an initial application.
5       Obviously we had some discussion because it wasn't clear to me
6       that Ashley Stewart was defaulting here, and apparently they're
7       not.  So, tell me what it is that you want me to immediately
8       do.
9                MR. HAROUTUNIAN:  Sure.  Your Honor, yeah, that's a
10      very important point, because when I read the defendant's
11      papers they are arguing that we're not entitled to money
12      damages on a motion or on a short motion.
13               We're not asking at this juncture for any money
14      damages.  We understand that that's something we will have to
15      take to court through the lawsuit.
16               The only thing we're asking for is that there is an
17      order from this court that the defendant actually go ahead and
18      buy and pay for the rest of the goods that they ordered, and if
19      they're unwilling or unable to do so, that this court, pursuant
20      to very well established law, grant the plaintiff a limited
21      license to sell off those goods to third parties.
22               THE COURT:  What is the amount of goods that had been
23      received for delivery, and what is the outstanding amount of
24      money that's owed?
25               MR. HAROUTUNIAN:  Sure.  Your Honor, the amount of
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

6

```
        87M7HOTC
1       money that has been shipped and not paid for at this time is
2       $185,000.  That is not the subject of today's motion.
3                The amount of goods that has been received and that
4       has not been shipped, and that is with my client is $253,000.
5       The papers have it down to the exact dollars, but it's $253,000
6       worth of goods that are represented to be 26,000 pairs.
7                THE COURT:  Slow down.  How much did you say were
8       already delivered and not paid for?
9                MR. HAROUTUNIAN:   185,000.
10               THE COURT:  And $253,000 of goods not yet been
11      delivered.
12               MR. HAROUTUNIAN:  Correct, your Honor.  For the record
13      --
14               THE COURT:  And your initial application is that you
15      be able to do what?
16               MR. HAROUTUNIAN:  That this court issue an order
17      giving us, giving the plaintiff a limited license to sell off
18      the goods unless the defendant is willing to purchase them
19      itself.
20               Those goods have the defendant's trademark on them.
21      Accommodations have been done, tags have been taken off.
22      However, even though they've blackened out the embroidery on
```

```
                         87M7HOTC (2)
23    it, we said in our own papers it still shows Ashley Stewart.
24             THE COURT:  I'm sorry.  They?  When you say they
25    blackened out, who blackened out?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                            7

```
      87M7HOTC
1              MR. HAROUTUNIAN:  My client.
2              THE COURT:  So, your clients has already made,
3     unilaterally made a decision to take Ashley Stewart labels off
4     the goods.
5              MR. HAROUTUNIAN:  Correct, your Honor.  My client has
6     actually, as was laid out in our original papers, my client has
7     made two sales of those goods to third parties when the
8     defendant was not purchasing the goods from it.
9              THE COURT:  And that was when in relationship to the
10    payment in the order?
11             MR. HAROUTUNIAN:  That was between March and May of
12    this year.  In relationship to this order, it's five months
13    after the goods arrived to the United States and were supposed
14    to be shipped to the defendant.
15             THE COURT:  And those goods were sold for what amount
16    of money?
17             MR. HAROUTUNIAN:  They were sold for a bit less.
18    Because they were sold to discounters, they were sold for about
19    20 percent less.
20             THE COURT:  What's the total amount of money they were
21    sold for?
22             MR. HAROUTUNIAN:  Well, I don't think there is any
23    amount of money, because what happened is once the goods were
24    shipped, then the defendant contacted the recipients of those
25    goods and told them you can't sell those goods, those are my
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                            8

```
      87M7HOTC
1     trademarks, you have to return it back to the plaintiff.
2              THE COURT:  Did your client ever get paid for those
3     goods by a third party?
4              MR. HAROUTUNIAN:  I don't believe that they paid for
5     it.  I think most of the goods were returned.
6              THE COURT:  What was the amount of the contract to
7     purchase the goods?
8              MR. HAROUTUNIAN:  The amount to the third parties?
9              THE COURT:  Yeah.
10             MR. HAROUTUNIAN:  I believe they were --
11             THE COURT:  Just approximately.
12             MR. HAROUTUNIAN:  Approximately -- actually I'll tell
13    you.  I guess it was approximately $40,000.
14             THE COURT:  And that's $40,000 in addition to the
15    amounts that you just gave me, $40,000 worth of goods, or was
16    that $40,000 of the $250,000 worth of goods?
17             MR. HAROUTUNIAN:  You're right, your Honor, it's part
18    of the $253,000, because those goods were returned, so now they
19    are part of the $253,000.
20             THE COURT:  So, no goods have been transferred to
21    third parties at this point at whole price or at discount,
22    because they have been sent back to your client.
23             MR. HAROUTUNIAN:  Correct.  The goods have been sent
24    back to the client, the defendant's papers acknowledge that
25    fact.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

87M7HOTC (2)

87M7HOTC                                                                 9

1           One minor point, maybe not so minor.  There was an
2  issue of about a thousand pairs of size 12 pants that had
3  arrived shorter than they were supposed to be, about two inches
4  shorter, and those pants were an obvious quality problem.  They
5  were returned to my client.  And I asked my client before
6  appearing here, and he explained to me that the 26,000 pairs we
7  are talking about do not include the 1,000 pairs of size 12
8  jeans, denim jeans, that was of bad quality.
9           THE COURT:  So, that's not included in this $250,000
10 amount.
11          MR. HAROUTUNIAN:  Correct, that is not included in the
12 $250,000 amount.
13          And, your Honor, as far as case law support -- I came
14 prepared with case law because I was being challenged on
15 this -- there is definitely case law on very similar
16 circumstances.  The preeminent case is the case of the Monte
17 Carlo case in the Ninth Circuit, Monte Carlo Shirt, Inc. v.
18 Daewoo International.  It's a Ninth Circuit case that has been
19 adopted I found about seven or eight times in this court, the
20 Southern District court citing to that case.  In that instance
21 the facts were very similar, goods were ordered, Monte Carlo
22 had ordered shirts from Daewoo, Daewoo was the manufacturer,
23 the goods got canceled.  And in that case it was actually
24 Daewoo's fault because -- it was their responsibility because
25 there were problems in customs clearance, so the goods arrived

87M7HOTC                                                                10

1  too late, so the trademark holder canceled the goods after the
2  goods had arrived to the United States.  The manufacturer
3  resold the goods to third parties, and the trademark holder
4  started an action for trademark infringement.  And the court
5  said very clearly that that is not trademark infringement.
6           THE COURT:  Well, but that's not the issue before me.
7  My first question is -- because I don't have that case in front
8  of me -- my first question is was that a case where the court
9  gave preliminary injunctive relief allowing them to sell the
10 goods before the case was resolved?
11          MR. HAROUTUNIAN:  I don't believe that that was the
12 fact in that case, your Honor.
13          THE COURT:  I mean you don't have to convince me that
14 you might ultimately be able to establish that if they don't
15 take the goods back or pay for them and pay you damages, that
16 you should be able to mitigate those damages by selling off the
17 goods.  That's a different question of whether or not your
18 client should up front have the right to sell off all of the
19 goods before this dispute is even resolved.
20          MR. HAROUTUNIAN:  Your Honor, on that point I made a
21 supplemental finding this morning, and I served my adversary
22 with that, just a short declaration from my client.
23          THE COURT:  Have you served it on me is the question,
24 since I try to read all the papers that come in up to two
25 minutes before I get on the bench, but it's usually kind of

87M7HOTC                                                                11

1  difficult.
2           MR. HAROUTUNIAN:  I understand, your Honor, and I just
3  gave it this morning, I gave it to I believe your law clerk.

```
                              87M7HOTC (2)
 4              THE COURT:  Which supplemental affidavit, since I have
 5    about six sets of papers?
 6              MR. HAROUTUNIAN:  It's a two-page declaration with two
 7    exhibits, and the title of it is Supplemental Declaration of
 8    Samuel Misree in support of order to show cause.  And the
 9    exhibits are financial statements from the plaintiff in this
10    instance.
11              Really the main point of that filing was to show that
12    this is a company that was capitalized with $700,000, and at
13    the end of last year, December 31 of 2007, the accountant had
14    indicated that the start-up costs were about $300,000, and the
15    point of it is is there is about $400,000 worth of capital that
16    this company has available.  The amounts of money between the
17    goods not sold and the receivables are more than $400,000,
18    which the point of it is that this is where there is
19    irreparable harm that could befall my client because all of his
20    capital right now is stuck between the goods that he cannot
21    sell and the goods that he sold and cannot get paid for.
22              THE COURT:  It seems to me even the amount of money
23    that you are talking about having your client have the right to
24    sell is not going to solve that problem.
25              MR. HAROUTUNIAN:  Well, $253,000, or 200 some odd
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

                                                                          12
```
      87M7HOTC
 1    thousand dollars, assuming there is a discount in the sale, is
 2    a substantial amount compared to -- I mean at least it will
 3    free up half of his capital, and we believe that will carry him
 4    through a decision, you know, through the regular course of
 5    litigation as to the balance of the $185,000 that is owed.
 6              THE COURT:  Well, based on what you've said so far
 7    it's unlikely that he is going to get as much as $200,000 for
 8    these goods in a third market.
 9              MR. HAROUTUNIAN:  Your Honor, I am assuming a 20 to 25
10    percent discount on the resales, so if $253,000 is the sale
11    price to Ashley Stewart, 20 to 25 percent of that being what he
12    would have to sell it for at a discount, so we are looking at
13    40 to $50,000 discount on those goods, he should be able to
14    sell them for $200,000.
15              THE COURT:  And he has buyers ready to buy these
16    goods?
17              MR. HAROUTUNIAN:  Yes, your Honor, that he does.  As a
18    matter of fact, he had previously sold them, and the goods were
19    returned.  So, there is no issue as to whether there are buyers
20    available to buy those goods, and from our perspective there is
21    really no real issue as to his right to resell them.  Obviously
22    defendant's papers, and I'm sure in a few minutes defendant's
23    attorneys will argue that point.  But, you know, we are making
24    the point that we do have the right to do that, that the case
25    law does protect our right to do so, and that a declaratory or
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

                                                                          13
```
      87M7HOTC
 1    injunctive relief from this court would just allow my client to
 2    do that which is his legal right to do so, but in an emergency
 3    situation such as this one, it will make sure that my client
 4    will continue doing business, and can survive, and can maintain
 5    his employees, while the court decides whether the balance of
 6    the money is owed to it.
 7              THE COURT:  Let me hear from the other side.
 8              MR. HAROUTUNIAN:  Thank you, your Honor.
```

```
                              87M7HOTC (2)
     9              THE COURT:  Mr. White?
    10              MR. WHITE:  There should be no preliminary injunction
    11    in this case.  As I'm going to explain, it's just a money
    12    damages case.  But beyond that, the balance of harms when
    13    considering whether to issue this injunction tilts heavily in
    14    favor of the defendants whose trademarks are at stake and are
    15    being put at risk by this requested injunction.
    16              Also, I'm going to show you in the minute, the
    17    plaintiff has very unclean hands that go directly to the heart
    18    of this matter.
    19              THE COURT:  Well, before you even get to that, let's
    20    deal with the reality of it and see if I can push the balance
    21    of equities in your favor.
    22              They say your client ordered goods and your client
    23    can't afford to pay for them, and your client has made no
    24    effort to tell them how or if they're ever going to pay for
    25    them.  So, let's start there.  What's the status, and what is
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                   (212) 805-0300
                                                                        14
          87M7HOTC
     1    your client's situation?
     2              MR. WHITE:  What is going on here, your Honor, is a
     3    situation in which the parties agreed both with their eyes open
     4    that a certain amount of goods were going to be brought to this
     5    country and that my client was going to buy them.  Then in the
     6    ordinary course -- as they always did together, and with no
     7    change to it -- they went and checked with the factor who said
     8    I'm not going to secure this, I'm not going to approve.  Then
     9    my client said, OK, let's just do it anyway, let's do it
    10    without the factor.  And then Hot Stitch said, OK, let's do it
    11    without the factor.  And everything would have been fine; my
    12    client was ready to buy those goods and pay for them.
    13              THE COURT:  Well, slow down.  Everything wouldn't have
    14    been fine, because the question is:  The goods are hear.  Is
    15    your client ready to pay for them?
    16              MR. WHITE:  My client has initiated a settlement
    17    negotiation concerning a global resolution that would include
    18    purchase of some of the goods.
    19              THE COURT:  That's not the answer to my question.  The
    20    answer to my question then I assume is no.  The goods were
    21    ordered, there was a contract for goods, and your client is not
    22    in a position to pay for those goods.
    23              MR. WHITE:  My client was in that position and so
    24    stated when those goods got here, please send them and I will
    25    pay for them.  Hot Stitch said no, I wont, I will not send you
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                   (212) 805-0300
                                                                        15
          87M7HOTC
     1    the goods, I'm going to limit the amount.
     2              THE COURT:  When was your client going to pay for
     3    them?
     4              MR. WHITE:  My client was ready to pay in full for the
     5    goods.
     6              THE COURT:  I don't want to go backwards.  Is your
     7    client ready to pay in full for the goods?
     8              MR. WHITE:  Not today, because there are differences
     9    now.  One of them is that my client has seen that some of these
    10    goods do not pass inspection.  The size 12s, for example,
    11    aren't the right length.
    12              THE COURT:  Let's put those aside.  Let's just deal
    13    with the goods that your client ordered and that your client --
```

```
                              87M7HOTC (2)
14      that meet your client's expectations.
15              MR. WHITE:  Another reason is that times have changed
16      and circumstances have changed.  My client only needs certain
17      quantities of goods at certain times of the year.
18              THE COURT:  All right.  But that doesn't change the
19      nature of the contract, does it?
20              MR. WHITE:  Well, you don't --
21              THE COURT:  You said to me first your client ordered
22      all of these goods and wanted them immediately.
23              MR. WHITE:  Yes.
24              THE COURT:  Now times have changed and your client
25      only wants a portion of the goods.  That's not the other side's
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
```
                                                                          16
```
        87M7HOTC
1       fault, is it?
2               MR. WHITE:  Yes, there is no allegation, and there is
3       no evidence of any specific contract for the taking of any
4       specific amount of goods at any specific time, but we did --
5               THE COURT:  You just said to me that all of these
6       goods were ordered by your client, and your client wanted all
7       of the goods, and your client was ready, willing and able to
8       accept all of the goods and intended to pay for all of the
9       goods.  You're saying they no longer have that intention?
10              MR. WHITE:  Because several things have happened to
11      change that.  One is Hot Stitch said no and didn't deliver them
12      when we could have put them in the stores and sold them.  Now
13      it's a later time, and it would be burdensome for us to have
14      all of those instead of having had them back when we needed
15      them.
16              THE COURT:  I understand what you're saying, but I'm
17      not understanding how it relates to most of our questions.
18      Does your client want these goods or not want these goods?
19              MR. WHITE:  Yes, my client is interested in some of
20      these goods.  My client has made --
21              THE COURT:  How much of these goods?  Your client no
22      longer wants all of these goods.  Putting aside the goods that
23      they acknowledge don't meet the specifications, all of the
24      other goods your client -- how much of those goods does your
25      client want?  And how much is your client able and willing to
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
```
                                                                          17
```
        87M7HOTC
1       pay for?
2               MR. WHITE:  I just received this case and haven't
3       asked my client all of those questions.
4               THE COURT:  Well, those are the most important
5       questions.  Most of the other arguments you have made seem to
6       be secondary to that.  I mean what are we going to do with
7       these goods?
8               MR. WHITE:  Well, one of the things that we know
9       according to the plaintiff's pleadings is that it wasn't
10      possible for them to take these trademarks off and instead they
11      close to deface the trademarks.  Now admittedly from their on
12      facts these goods exist with trademarks on them that are
13      defaced trademarks.
14              THE COURT:  So, you tell me how this should be
15      resolved then.  Tell me if this was realistically equitably
16      resolved, what would happen?
17              MR. WHITE:  Well, one way it could be realistically
18      equitably resolved would be to be sure that the plaintiff is
```

```
                         87M7HOTC (2)
19   told not to sell any more of our trademarked goods without our
20   authorization, which is plainly illegal under the El Greco
21   Leather case in the Second Circuit.
22            THE COURT:  And then what is it they are supposed to
23   do with these goods?
24            MR. WHITE:  We will talk to them about how many of
25   these can be taken and used.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                                    18
```
     87M7HOTC
 1            THE COURT:  Don't tell me what you will talk to them
 2   about.  Tell me what it is that they should have to do with
 3   these things.
 4            MR. WHITE:  We will pay them $5 a pair for the jeans
 5   that are defaced, except for the size 12s.
 6            THE COURT:  Which is what percentage less than what
 7   you reasonably agreed to pay?
 8            MR. WHITE:  It's more -- I think the price had been
 9   $9.
10            THE COURT:  So you want to pay them basically about 60
11   percent of what the original agreement was.
12            MR. WHITE:  Yes.  And, remember, your Honor, they have
13   materially breached all of their commitments to us by going
14   behind our back and selling our trademarked goods in the
15   discount shops.
16            THE COURT:  Well, but they say you materially breached
17   by not paying them for the goods you said you would pay for
18   when they got here.  So I don't know who is in breach.
19            MR. WHITE:  Yes, you do, because they admit in an
20   e-mail that the court has that at the time we caught them
21   selling our goods to the discount houses without our
22   authorization we had to that time taken all the goods that they
23   wanted us to take, and we had paid in full for all of the goods
24   that they sent to us.
25            THE COURT:  But you weren't willing or able to pay for
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                                    19
```
     87M7HOTC
 1   the goods they had on hand.
 2            MR. WHITE:  That's incorrect, your Honor.  And as they
 3   admit in their e-mail, we were willing to pay for all of the
 4   goods that they had on hand at the outset, and they were the
 5   ones who said no.
 6            THE COURT:  Wait.  But there was obviously some.
 7   miscommunication.  You are telling me that your client was
 8   financially willing and able to pay them at that time the
 9   contract price for those goods?
10            MR. WHITE:  45 day payment terms is what we always had
11   with them.
12            THE COURT:  Well, I am not asking about 45 payment
13   terms.  I'm asking you whether or not your client could afford
14   to pay for the goods.
15            MR. WHITE:  Yes.
16            THE COURT:  And can your client afford to pay for the
17   goods now?
18            MR. WHITE:  My client doesn't have any trouble with
19   affording any of this.  That's not what this is about.
20            THE COURT:  The original price.  That's not at issue
21   whether or not your client can afford to pay the original
22   price?
23            MR. WHITE:  Yeah, my client's financial ability to pay
```

```
                         87M7HOTC (2)
24     any of this is not part of our defense.
25             THE COURT:  So, I don't understand what your defense
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                    20

```
       87M7HOTC
 1     is.  Why is it your client is refusing to pay the original
 2     contract price for the goods?
 3             MR. WHITE:  For a variety of reasons, including that
 4     we are now dealing with someone who perpetrated the worst
 5     possible breach of trust in this industry.
 6             THE COURT:  Let's put aside the breach of trust.
 7     Let's talk about realistically profit, dollars and cents.
 8             I mean, if you don't want to do business with the guy
 9     any more, that's one thing, but I'm not asking about whether
10     your client is insulted by the fact that he is dealing with
11     somebody he doesn't like anymore.
12             Is there some reason why your client thinks they
13     shouldn't have to pay full price for the goods if the goods
14     conform to the original contract?
15             MR. WHITE:  Yes, there is more than one reason.  One
16     is the lateness with which they now want to give us the goods.
17             THE COURT:  So, you can't make a profit off the goods
18     now?
19             MR. WHITE:  Not as well as we could have when they
20     were timely.
21             THE COURT:  Well, what does it mean, "as well"?
22             MR. WHITE:  We have to go out and get other jeans and
23     make other arrangements by now.  I don't have all the
24     information here because we just got this case, as to all the
25     disadvantages of getting these late rather than getting them on
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                    21

```
       87M7HOTC
 1     time.
 2             THE COURT:  Well, that's why I want to be clear about
 3     what representations you are making about that, because if you
 4     don't have any --
 5             MR. WHITE:  I would have to look into that.
 6             THE COURT:  All right, so you don't know.
 7             MR. WHITE:  I don't know.  But I do know --
 8             THE COURT:  So, that's not an argument for me to
 9     consider if you don't know.
10             MR. WHITE:  I do know the jeans aren't in proper
11     condition, they have been defaced already.  They have tried to
12     scratch out the embroidery without success; that isn't a good
13     thing.
14             THE COURT:  Do you want the jeans or you don't want
15     the jeans?
16             MR. WHITE:  I have learned that my client wants the
17     jeans at $5.  I did learn that.
18             THE COURT:  Your client wants the jeans the $5?
19             MR. WHITE:  We will take the jeans at $5.
20             THE COURT:  And how much money would that be?
21             MR. WHITE:  I think it's -- do you know how many
22     thousand pairs it is?
23             MR. HAROUTUNIAN:  Sure, 26,000, so that would be
24     $130,000 as opposed to $253.
25             MR. WHITE:  And that's without the size 12s.  And I
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                    22

```
                          87M7HOTC (2)
       87M7HOTC
 1     don't have the information as to how many size 12s there are.
 2             MR. HAROUTUNIAN:  Your Honor --
 3             THE COURT:  Now, let me finish with Mr. White, because
 4     let's see where we are at this point.
 5             If your client -- then, is there any reason why your
 6     client wouldn't be willing today to give them $130,000 and take
 7     the jeans back?
 8             MR. WHITE:  I could call my client about that, and it
 9     sounds look a good idea, but we also have a counterclaim for
10     trademark infringement.
11             THE COURT:  I understand that, but I'm just trying to
12     figure out what the right status quo is in equitable relief,
13     because that doesn't resolve their dispute with you.  It
14     doesn't resolve their case against you, and it doesn't resolve
15     the case against them, but at least it puts aside who has to do
16     something with the jeans and transfers $130,000.
17             Now, is there any reason why you shouldn't give them
18     the $130,000, take the jeans back and then further resolve this
19     dispute with regard to damages?
20             MR. WHITE:  The damages that they've caused to us from
21     the trademark infringement?
22             THE COURT:  Or the damages you caused to them,
23     depending on which one of you wins.
24             MR. WHITE:  Because they're not going to be able to
25     prove that we caused any damages to them.  Their e-mails
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

23

```
       87M7HOTC
 1     already with the court admit that their harm is self-inflicted
 2     and also admit that they caused harm to us.
 3             THE COURT:  OK.  So, then what are your damages, and
 4     why would that prevent you from doing exactly what I just
 5     suggested?
 6             MR. WHITE:  Well, I'm willing to see if I can get in
 7     touch with my client and do something like what the court is
 8     talking about.
 9             THE COURT:  What do you claim is the amount of your
10     damages?
11             MR. WHITE:  For breach of trademark?  Ordinarily you
12     would have to get an expert witness and testimony.  I haven't
13     calculated that.
14             THE COURT:  Well, I can calculate it right now.  It
15     seems like your damages are either statutory or they're de
16     minimis.
17             MR. WHITE:  Well, the problem that comes --
18             THE COURT:  Right?
19             MR. WHITE:  No, your Honor.
20             THE COURT:  Well, what damages could you even
21     articulate now if they only sold $40,000 worth of jeans to
22     somebody else and you got them back, and you made them turn
23     them back?
24             MR. WHITE:  But that isn't the problem in a trademark
25     case like this.  Our client is a cutting-edge fashion house
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

24

```
       87M7HOTC
 1     that has its own design and own designer label.  You can't have
 2     Ashley Stewart jeans at Burlington Coat.
 3             THE COURT:  But they're not at Burlington Coat.
 4             MR. WHITE:  But they were.
```

Page 11

```
                              87M7HOTC (2)
 5             THE COURT:  Not anymore.
 6             MR. WHITE:  And we caught them there.
 7             THE COURT:  Did they put them on the shelf?
 8             MR. WHITE:  Hot Stitch actually told Burlington Coat
 9   that it had a release from us.
10             THE COURT:  It doesn't matter.  That's not a measure
11   of damages.  I'm asking you what the measure of damages are.
12   You're not even telling me that Burlington Coat ever put them
13   on the rack.
14             MR. WHITE:  We saw them on the rack.  Our buyer went
15   into Burlington Coat and saw them on the rack.
16             THE COURT:  OK.  As an experienced attorney, what do
17   you think you could possibly get in terms of damages on a case
18   where they put them on the rack, you forced them to take them
19   off the rack, not a single item was sold, they gave the items
20   back to them, and then they're going to give the items back to
21   you?  Do you think that's millions of dollars worth of damages?
22             MR. WHITE:  I don't see any evidence before the court
23   at all about how many items Burlington Coat or Ross has sold.
24             THE COURT:  Well, what do you claim is the extent of
25   the copyright damages?  Isn't it measured by profits?  Isn't
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

25

```
     87M7HOTC
 1   that usually how it's measured, on loss?
 2             MR. WHITE:  No, but there is also the harm to the mark
 3   and the harm to the value that we have in the name.
 4             THE COURT:  And in your experience --
 5             MR. WHITE:  It's like a defamation, for example.
 6             THE COURT:  And in your experience, given the
 7   circumstances you are aware of here, do you think that you have
 8   a significant amount of copyright damages to your client's
 9   copyright under these circumstances?
10             MR. WHITE:  Yes, we are entitled to prove --
11             THE COURT:  How much?
12             MR. WHITE:  Six figures.
13             THE COURT:  You think you can get six figures out of
14   it?
15             MR. WHITE:  I can certainly try to prove it.
16             THE COURT:  Well, you can try anything.  Lawyers come
17   in here and try anything all the time, but I don't hear a
18   realistic -- I'm not even looking from a judge's point of view;
19   I'm looking from a jury point of view.
20             You think you can take $40,000 worth of jeans that
21   were thrown on the rack, that you forced them to take off the
22   rack, that you ultimately get back, and get yourself six
23   figures worth of copyright damages?
24             MR. WHITE:  And it's analogous to defamation.  Ashley
25   Stewart jeans don't belong at Burlington Coat Factory or Ross.
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

26

```
     87M7HOTC
 1   It implies we are an off-label brand, it implies that we're
 2   selling last year's fashions, it implies lower quality.
 3             THE COURT:  I understand the law, but it's not
 4   comparable to defamation.
 5             MR. WHITE:  It's analogous to that.
 6             THE COURT:  No, it's not analogous to defamation.  No,
 7   it's analogous to what financial harm or what harm is suffered
 8   by your client because they put these number of jeans on the
 9   rack, and depending on what --
```

```
                              87M7HOTC (2)
      10            Do you claim that Burlington Coat Factory sold any of
      11   these jeans?
      12            MR. WHITE:  I don't have that evidence here.  I just
      13   got this case Thursday; I don't know that.
      14            THE COURT:  Well, at this point you're not in a
      15   position to argue that they sold a single pair of jeans.
      16            MR. WHITE:  I don't have that information.  I can try
      17   to get that information.
      18            THE COURT:  Well, I'm going to assume they didn't
      19   until you tell me they did.  So, let's assume they didn't sell
      20   a single pair of jeans before you caught them and told them to
      21   send it back.
      22            MR. WHITE:  I think that's a surprising assumption.  I
      23   have not learned that information.
      24            THE COURT:  Let's say they sold ten pairs of jeans.
      25   Does that take it to six figures?
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                   (212) 805-0300
```

                                                                          27
```
           87M7HOTC
       1            MR. WHITE:  Your Honor, obviously people talk.  The
       2   jeans were there.  They were put in the public at Burlington
       3   Coat and Ross.  This is the reason why the trademark law is the
       4   way it is.  When you own a trademark, and you register it, and
       5   you are the only one who can authorize where it can be.
       6            THE COURT:  I understand all of that.
       7            MR. WHITE:  They did exactly the thing you can't do
       8   for exactly the reason you can't do all.
       9            THE COURT:  I understand all of that.  I understand
      10   your position, but that doesn't convince --
      11            Let's put it this way.  I always say to lawyers, the
      12   most effective advocacy is to be consistently reasonable.
      13            If your argument is based on the fact that you expect
      14   me to accept you've got a six figure case over a bunch of jeans
      15   that were put on the rack, taken off the rack and given back
      16   and you're ready to take back, you are not going to convince me
      17   of the merits in your compelling case based on that argument.
      18   And I've had enough copyright and trademark cases to know that
      19   you're not talking about six figures based on anything that you
      20   presently know about this case.  You can guess, and you can
      21   puff it, but there is nothing that you presently know --
      22            MR. WHITE:  I'd have to look into it.
      23            THE COURT:  Right.  So, there is nothing you presently
      24   know about this case that gives you a basis to in good faith
      25   argue to me that you expect this to be a six figure case.
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                   (212) 805-0300
```

                                                                          28
```
           87M7HOTC
       1            MR. WHITE:  No, but --
       2            THE COURT:  All right.
       3            MR. WHITE:  But if the court wants to help us work out
       4   a settlement, or have a magistrate or mediator to help us do
       5   this, we can start getting information.
       6            THE COURT:  I'm very happy to do that, but I'm trying
       7   to figure out what it is you are realistically trying to do
       8   other than avoid paying for the jeans.
       9            MR. WHITE:  One of the most important things we want
      10   to make sure doesn't happen is a repeat of the situation where
      11   our trademark jeans are showing up at Burlington Coat and at
      12   Ross's.
      13            THE COURT:  If your client wants to prevent that, I
      14   will order that they not be able to sell a single pair of jeans
```

```
                         87M7HOTC (2)
15   if, as you said, your client wants the jeans back, is willing
16   to give them the $130,000 that you say the jeans are minimally
17   worth, and then you can fight about it and see if you can
18   resolve the rest of it.  That seems reasonable to me.  Does
19   that seem unreasonable to you?
20            MR. WHITE:  Your Honor, it's very attractive to me.  I
21   think it sounds very reasonable, because it protects our key
22   trademark rights and it gives us the opportunity to --
23            THE COURT:  They may not get any more than $130,000,
24   and end up giving back all $130,000 for all I know, if you
25   think are you going to win your six figure case.  But I mean
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```
                                                                      29
```
     87M7HOTC
 1   I'm just trying to figure out how I can maintain at least some
 2   reasonable status quo and not make this thing worse than it is.
 3   And quite frankly it is worse than it is.
 4            I'm glad you're here, and it's from my insistence you
 5   are here, because they were here asking for ex parte relief
 6   before.  And it's beyond me that Ashley Stewart just made a
 7   decision to default this case and could have been aware of
 8   their application and not taken any position in this case.
 9            MR. WHITE:  I think we're moving in a very helpful
10   direction, so if the court wants to order something like what's
11   just been described, it sounds reasonable.  I suppose the
12   alternative is to try to get more communications and more
13   information on the phone.
14            THE COURT:  And send you directly to the magistrate to
15   see if you can resolve this dispute, either on that basis or
16   some other basis.  And, if not, as I say, there are only two
17   choices:  You can fight it out or work it out.
18            MR. WHITE:  But, your Honor, I don't want to repeat
19   myself if I don't have to, but we don't want to leave here
20   today without knowing that they're not going to sell these
21   jeans without authorization.  That's the key.
22            THE COURT:  Well, they won't do that until I tell them
23   they can do that.
24            So, Mr. Haroutunian, what is your position, your
25   initial reaction to my attempt to maintain at least some
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```
                                                                      30
```
     87M7HOTC
 1   reasonable status quo?
 2            MR. HAROUTUNIAN:  Your Honor, there is no issue about
 3   that.  My client is awaiting direction from the court.
 4            THE COURT:  No, I'm not talking about that.  I'm
 5   talking about you give them the jeans back, they give you the
 6   $130,000, and you fight about the rest.
 7            MR. HAROUTUNIAN:  Your Honor, sitting here it seems to
 8   me like an eminently reasonable way of working out the
 9   immediate issue.  It would help out my client from a cash flow
10   perspective, we could be on a fast track to trying to resolve
11   globally the issues here.
12            There are very limited issues here.  The only thing,
13   just it's probably because my adversary had just been brought
14   into the case, the defacement of the trademark, you know,
15   they've only been -- none of the 26,000 pairs, whatever, I mean
16   it's only the amount, the 4,000 pieces that went to the third
17   parties that were defaced; the rest of them are in their
18   original format.  So, there is no issue about them being
19   defaced.
```

```
                            87M7HOTC (2)
20              The only other thing, from our perspective, when the
21     goods arrived here, we -- I believe my adversary said that
22     there is no contract in evidence.  Well, the contract is the
23     purchase order.  There is no denial, and their own papers admit
24     that, and the purchase order is a contract.
25              THE COURT:  Look, you don't have to convince me of all
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

                                                                      31
```
       87M7HOTC
 1     of that.  It's clear to me that you guys didn't stumble into a
 2     room and a bunch of jeans fell into a room.  I know there is a
 3     contract.  So, let's try to move forward.
 4              My position at this point is I'm willing to order the
 5     plaintiff cannot transfer any jeans to anyone other than the
 6     defendant, and that if the defendant proffers up front $130,000
 7     to be given to the plaintiff within the delivery of the $30,000
 8     within 30 days, and then delivery of all of those jeans back to
 9     the defendant immediately upon payment of the cash, then -- or
10     simultaneously upon payment of the cash, then, you know, in the
11     meantime I will be willing to send you to the magistrate judge
12     to see if you can further resolve this dispute either on that
13     basis alone or on some other basis.  And if you cannot, then it
14     seems to me that whichever side wins this case can be further
15     compensated in damages.
16              MR. WHITE:  And the jeans that come to us under that
17     order will not include size 12s and will not include jeans that
18     have been defaced by the attempt to take our trademark off of
19     them.
20              THE COURT:  You're talking about the -- how many of
21     the size 12 jeans did you have?
22              MR. HAROUTUNIAN:  No, the size 12s have either been
23     destroyed or sent back.  There is no size 12s.
24              THE COURT:  You're not responsible in any event to pay
25     for those size 12s.
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

                                                                      32
```
       87M7HOTC
 1              MR. HAROUTUNIAN:  Right.
 2              THE COURT:  And with regard to the 4,000 units, the
 3     4,000 units, if you want them back, you can have them back, if
 4     you want to hang on to them, you can hang on to them, but you
 5     still can't sell them.
 6              MR. HAROUTUNIAN:  No problem.
 7              THE COURT:  So if you want to include that or not
 8     include that in the $130,000, the approximate payment that you
 9     are saying in the meantime that will at least transfer the
10     jeans, then do whatever you want with the jeans.
11              Obviously if you sell the jeans for five times as
12     much, if they win, then they're going to get part of that
13     profit.
14              Or if you want to pursue your trademark infringement
15     claim and you think, as they say, it's worth pursuing, that you
16     are really going to recover more than you have to pay the
17     lawyers, then I would go ahead a pursue that.
18              MR. WHITE:  There is fee shifting under the statute
19     too.
20              THE COURT:  That's true.  But as they say, every trial
21     is a risk, and every lawsuit is an expense.  So, you know, as I
22     say, if it's worth pursuing, then pursue it.
23              But that's my position at this point.  I think my
24     position is fairly clear.  Unless someone has some issue or
```

```
                              87M7HOTC (2)
       25      problem with that, at least immediately, then I will order that
                              SOUTHERN DISTRICT REPORTERS, P.C.
                                       (212) 805-0300
                                                                                    33
               87M7HOTC
        1      you move forward on that basis.
        2              If for some reason that one side or the other decides
        3      that they're not going to move forward on that basis, then you
        4      will let me know by letter and I will immediately decide
        5      whether or not I will issue any other further relief.  And my
        6      guess is the relief will be to the other side.
        7              So, I would urge it upon you, as I always say, before
        8      you even talk to your client, I want to know whether the
        9      lawyers think it's reasonable.  If you don't think it's
       10      reasonable and it's not something you are going to recommend to
       11      your clients, then there is no reason for you to talk to your
       12      clients.
       13              MR. WHITE:  I find it to be reasonable, your Honor.
       14              MR. HAROUTUNIAN:  I do too.
       15              THE COURT:  Why don't you proceed on that basis.  The
       16      magistrate judge is Judge Dolinger.  I'm going to make a
       17      referral to magistrate Judge Dolinger immediately for
       18      settlement discussions.
       19              MR. WHITE:  Yes.
       20              THE COURT:  So, if you want to get in there right
       21      away, I will call him personally today and tell him that I
       22      referred it to you.  If you don't hear from him literally
       23      within a week, I will call his chambers, because I want to get
       24      you right in and see if you can resolve this.
       25              Obviously if you can otherwise resolve it on your own,
                              SOUTHERN DISTRICT REPORTERS, P.C.
                                       (212) 805-0300
                                                                                    34
               87M7HOTC
        1      given the status as it is now, then try to resolve this for
        2      your clients before your clients go through any further time,
        3      effort and expense.
        4              The next date is February 19.  That's basically -- I'm
        5      going to leave that date on.  But if you need to be before me
        6      instead of Magistrate Dolinger, if discussions fall apart or
        7      there is some further application or issue that I need to
        8      address, then bring it to my attention by letter.  If I need to
        9      bring you in again, you will come in before then to discuss it.
       10      If I just need to resolve it, then as soon as I get an
       11      appropriate response, I will resolve it so that you can move
       12      forward.
       13              So, hopefully I won't have to see you in February and
       14      it will be resolved long before then.  But otherwise if for
       15      some reason discussions break down, we will start moving
       16      forward with discovery and then follow as close as you can the
       17      scheduling order that I proposed.  And I will be obviously
       18      somewhat flexible with that schedule if I know you are making
       19      progress in settlement discussions.  All right?
       20              MR. HAROUTUNIAN:  Thank you.  So, as things stand that
       21      would be the end date for discovery, February 19, 2009?
       22              THE COURT:  Do you have a copy of the proposed
       23      scheduling order that I sent out?  Did I send out a scheduling
       24      order?  I may not have.
       25              Did you receive a scheduling order with the initial
                              SOUTHERN DISTRICT REPORTERS, P.C.
                                       (212) 805-0300
                                                                                    35
               87M7HOTC
```

```
                         87M7HOTC (2)
 1   notice of the first conference?
 2           MR. HAROUTUNIAN:  I don't believe I did, your Honor,
 3   because we just filed the case last --
 4           THE COURT:  OK.  If there are some delays, let me know
 5   and let me know why.  But I will see if I sent out the
 6   scheduling order or not.  If not, I can send out another one
 7   for you.  If those dates are good, take those dates.  If not,
 8   see if you can agree on different dates and propose them to me.
 9           MR. HAROUTUNIAN:  Thank you, your Honor.
10           MR. WHITE:  Thank you, your Honor.
11           THE COURT:  I will await to hear from you.
12                              - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```