UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HOT STITCH, LLC,

                Plaintiff,

-against-

ASHLEY STEWART, LTD.,
URBAN BRANDS, INC. and
ETHAN SHAPIRO,

                Defendants,

Docket No. 08 CV 6296

**DECLARATION OF GEORGIA SMITH IN OPPOSITION TO MOTION FOR PRELIMINARY DECLARATORY ORDER**

---

Georgia Smith, being duly sworn, deposes and says:

1. I am the head denim buyer at Ashley Stewart, Ltd., ("Ashley Stewart") and am fully familiar with the facts and circumstances discussed herein.

2. I make this affidavit in opposition to Plaintiff Hot Stitch, LLC's ("Hot Stitch") motion for an order declaring that, unless defendant Ashley Stewart, Ltd. ("Ashley Stewart") fully pays within ten days for all Ashley Stewart branded apparel in Hot Stitch's possession, Hot Stitch is granted a limited license for the sale of any Ashley Stewart branded apparel produced by Hot Stitch.

3. In its motion and the accompanying affidavit of Samuel Mesrie ("Mesrie Affidavit"), Hot Stitch claims that Defendants somehow tricked Hot Stitch into ordering a large quantity of denim jeans, then refused to take delivery of the jeans, leaving Hot Stitch holding the merchandise and being unable to sell it to any third parties due to trademark issues. As explained below, however, Ashley Stewart never misled Hot Stitch in any way. Rather, Hot Stitch, having been fully informed of Ashley Stewart's credit situation, refused to ship available goods to Ashley Stewart when Ashley Stewart needed the merchandise and was ready, willing

B3526205.2

and able to accept and pay for it. Thereafter, when Ashley Stewart's inventory needs decreased for the summer months (as Ashley Stewart had warned Hot Stitch would happen), Hot Stitch, without the knowledge or authorization of Ashley Stewart, wrongfully sold some of the goods to competitors of Ashley Stewart at a discount. When confronted with its wrongful acts, Hot Stitch's CEO Samuel Mesrie admitted "[a] huge mistake was made by [Hot Stitch] .... I personally did not do it, but I am ready to take full responsibility .... I am willing to make ammends [sic]." See June 11, 2008 email from Sammy Mesrie to Ethan Shapiro, a true copy of which is attached hereto as **Exhibit A**. Mr. Mesrie also admitted that Ashley Stewart "all along ... took delivery and paid for the goods in full & on time," but that Mr. Mesrie had decided to wrongfully sell the goods to discount houses because of "desperation with [his] cash flow." See June 20, 2008 email from Sammy Mesrie to Ethan Shapiro, a true copy of which is attached hereto as **Exhibit B**. Hot Stitch is now engaging in retroactive finger-pointing in an effort to shift the blame for its own self-inflicted harm.

4. Ashley Stewart owns and operates specialty retail clothing stores that exclusively sell ASHLEY STEWART® branded apparel. Ashley Stewart also operates a website for the same purpose. Since the early 1990's, Ashley Stewart has been styling customers and setting fashion trends for the plus-size fashion industry. Ashley Stewart currently has nearly 200 stores located in urban areas across the United States, and last year had sales of over $100 million.

5. In or around May 2007, Ashley Stewart began using Hot Stitch as a supplier of ASHLEY STEWART® branded denim garments. Hot Stitch was the successor to a company named Just Ernie, Inc. Just Ernie was one of Ashley Stewart's largest vendors in the previous year and was run by Ernie Baumgarten, who became a partner at Hot Stitch. Hot Stitch's other partner is Samuel Mesrie. Most of my dealings were with Mr. Baumgarten.

6. As is customary in our industry, Ashley Stewart would place purchase orders with Hot Stitch based on its anticipated needs 120-180 days out from the order. For example, orders that Ashley Stewart placed in July were based on its anticipated needs in November or December. Traditionally, I place very few denim orders from March through May, because Ashley Stewart's denim sales during the summer months are much less than during the rest of the year. I begin placing more orders in June to prepare for the higher volume fall months.

7. Upon information and belief, once it received the orders from Ashley Stewart, Hot Stitch would have the jeans produced overseas, imported to the United States, affixed with the ASHLEY STEWART® mark, and shipped to Ashley Stewart. As Hot Stitch well knows, Ashley Stewart sells the goods exclusively through Ashley Stewart stores and its website, a practice which enables Ashley Stewart to ensure the quality of goods with the ASHLEY STEWART® brand on them and which contributes to the exclusivity and appeal of the brand.

8. Prior to November 2007, most, but not all, of Ashley Stewart's purchase orders went through a process known as "factoring." Pursuant to this process, a third-party bank, called a "factor," certifies Ashley Stewart's creditworthiness. Once the factor approves the creditworthiness up to a certain limit, it advances funds to Hot Stitch and assumes Hot Stitch's risk and responsibility for collection and management of receivables. In our dealings with our suppliers generally, and in our dealings with Hot Stitch in particular, the factor approval process occurs <u>after</u> the goods are manufactured and shipped to the seller in the United States, but <u>before</u> they are shipped to Ashley Stewart. Hot Stitch's characterization of the sequence of events in the factoring process in paragraphs 15-17 of its Complaint, and paragraphs 20-26 of the Mesrie affidavit, is therefore incorrect as it relates to Ashley Stewart's dealings with Hot Stitch.

9. Pursuant to several purchase orders that Ashley Stewart placed in early October 2007, Hot Stitch had a large quantity of jeans imported into the United States. The goods arrived in November 2007. At this time, Ashley Stewart learned and informed Hot Stitch that it was not eligible for factor approval because of credit line limitations. I note that the only "support" Mr. Mesrie points to for his allegations are emails he sent to Ashley Stewart in June 2008, well after the supposed agreements, when he was attempting to deflect blame from Hot Stitch's decision to unlawfully sell Ashley Stewart's goods to third party competitors at a discount.

10. After Ashley Stewart informed Hot Stitch of its inability to obtain factor approval, Hot Stitch made the business decision not to ship the entire quantity of goods to Ashley Stewart. Instead, Hot Stitch was willing to ship the goods in increments of $200,000 pursuant to a revolving line of credit. I warned Mr. Baumgarten that Hot Stitch was taking a risk, because Ashley Stewart's inventory needs would decrease from March through May 2008 due to slow denim sales during the summer, meaning that Hot Stitch could be left with extra inventory for those months. I made it clear that orders would pick up again in June as Ashley Stewart prepared for the fall. Mr. Mesrie's statement in paragraph 34 of his affidavit that "it became clear that Ashley was not going to purchase or pay . . . in a reasonably timely manner" is therefore untrue, because I informed Mr. Baumgarten in December 2007 or January 2008 that Ashley's orders would slow from March through May, then increase beginning in June. Indeed, in an email to Ethan Shapiro on June 20, 2008, Mr. Mesrie stated "I admit that all along you took delivery & paid for the goods in full & on time." See **Ex. B**.

11. Hot Stitch, however, would not ship goods above increments worth $200,000 because it did not want to carry risk above $200,000. See June 20, 2008 email from Ethan Shapiro to Samuel Mesrie, a true copy of which is attached hereto as **Exhibit C** (noting that Hot

Stitch would "not ship [Ashley Stewart] all the available goods because [it was] afraid to carry the paper on [its] own"). At the time, Ashley Stewart, which had never made a late payment to Hot Stitch, was ready and willing to pay for all of the goods covered by the orders. In fact, Ashley Stewart needed the goods to strengthen its inventory for the winter months. The quantity of goods Hot Stitch offered to ship pursuant to the line of credit was insufficient for Ashley Stewart's inventory needs at the time, but Ashley Stewart accepted this disadvantageous arrangement so that it could obtain at least part of its inventory needs. Eventually, we are able to get Hot Stitch to increase the size of the shipments to $300,000, but even that was insufficient for our needs. As a result of Hot Stitch's decisions, Ashley Stewart's sales and business plan suffered, because it did not have sufficient inventory for the winter months. Specifically, as of January 28, 2008, Hot Stitch had 58,840 pairs of jeans remaining to be shipped. Over the next month, Hot Stitch only shipped 24,120 pairs of jeans to Ashley Stewart. This total does not include around 1,000 pairs of size 12 petite jeans, which I had to recall from our stores and return to Hot Stitch because they had a defective inseam. Upon information and belief, these 1,000 defective jeans make up a portion of the 26,712 jeans Hot Stitch claims it has in its possession and is asking this Court for permission to sell.

12.     As I had warned Hot Stitch, from March to May 2008, Ashley Stewart's inventory needs decreased. I asked Hot Stitch to hold the remaining 34,720 pairs of jeans until June 2008. From March through May 2008, I created orders for 8,899 pairs of jeans from Hot Stitch during that time in order to chip away at the inventory. As I had told Mr. Baumgarten, Ashley Stewart's inventory needs did in fact increase beginning in June 2008. For example, at the time Ashley Stewart found out about Hot Stitch's unlawful acts in the form of unauthorized sales, Ashley Stewart had an order to Hot Stitch for 4,800 pairs of jeans to ship on June 18.

13.  Sometime during March to May 2008, Hot Stitch, without Ashley Stewart's knowledge or permission, sold some of the jeans, which were still affixed with the ASHLEY STEWART® mark, at a discount to third party competitors, including Burlington Coat Factory ("Burlington") and Ross Department Stores ("Ross").

14.  Ashley Stewart found out about the illegal sales in early June when one of my fellow buyers who was shopping in Burlington happened to see the jeans on sale. Ashley Stewart immediately contacted Mesrie. Mesrie at first said he was not sure what happened, but later admitted that Hot Stitch had needed cash and therefore made the sales, although he placed the blame on Baumgarten, who had left Hot Stitch by that time. See **Exs. A and B**.

15.  When Ashley Stewart found out about Hot Stitch's illegal actions, it contacted Burlington and Ross and demanded that they have the items removed from the stores. Burlington informed Ashley Stewart that Hot Stitch had shown it a "release" by Ashley Stewart purportedly allowing Hot Stitch to sell the goods provided they removed the ASHLEY STEWART® mark. Ashley Stewart never provided Hot Stitch any such "release," nor did Hot Stitch remove the ASHLEY STEWART® mark from the jeans. Indeed, in his affidavit, Mr. Mesrie admits that "[b]ecause the "Ashley Stewart" name was embroidered in the garment," it was impossible for Hot Stitch to completely remove it. See Mesrie Aff. ¶ 38. Mr. Mesrie instead represents that Hot Stitch blacked out the ASHLEY STEWART® mark. This representation, however, is contradicted by one of the exhibits that Mr. Mesrie attaches to his own affidavit. According to the June 17, 2008 email from Stacy Haigney to Jane Taylor, **Ex. E** to the Mesrie Affidavit, the ASHLEY STEWART® name was "embroidered in [the jeans] and can not be removed **or blacked out**" (emphasis added).

16. Because the goods were sold without Ashley Stewart's knowledge or authorization, Ashley Stewart was deprived of the opportunity to examine the goods in order to ensure that they met the quality and design standards for goods affixed with the ASHLEY STEWART® mark.

17. In addition, Burlington and Ross re-sold the goods at prices beneath what Ashley Stewart charges for the same goods in its own stores and website. Ashley Stewart sells the jeans at its stores and on its website for $19.99, but Burlington had them on sale for $14.99. This difference in price gave consumers the incentive to by-pass Ashley Stewart stores and purchase the goods at a discount.

18. Finally, as mentioned above, Ashley Stewart sells its ASHLEY STEWART® brand exclusively through approximately 200 specialty retail clothing stores across the United States and is a trend setter in the plus-sized fashion industry. The selling of goods with the ASHLEY STEWART® mark by discount retailers who are often associated with lesser quality goods or discontinued styles hurts the exclusivity of the ASHLEY STEWART® brand. As Mr. Mesrie himself put it in his June 20, 2008 email to Ashley Stewart (**Ex. C** to the Mesrie Affidavit), "Did I hurt you with me selling the goods, very possible . . . ."

19. Behind the elaborate contrivance of the blame shifting tale in the Mesrie Affidavit is the following basic truth: "Simply put, you did not ship us all the available goods because you were afraid to carry the paper on your own, your absolute right to do so. After that you got greedy and sold our goods, without our release, which you would not ship to us at full cost, to competitors at a discount." See **Ex. C**.

20. I understand that Hot Stitch has asked this Court for a license to do what it has already unlawfully done: sell jeans with the ASHLEY STEWART® mark to third party discount

07/21/2008  15:57    12017700281                    URBAN BRANDS                              PAGE  02/02

retailers. This Court should not reward or perpetuate Hot Stitch's unlawful behavior. Hot Stitch's effort to hold Ashley Stewart liable is nothing more than an attempt to deflect the blame for self-inflicted harm caused by its business decision not to ship all of the jeans to Ashley Stewart from November 2007 through February 2008. Granting such a motion would harm Ashley Stewart in the same ways that Hot Stitch's previously unauthorized sales did. Indeed, the harm would be greater because the quantity of jeans would be larger, and would include around 1,000 pairs of jeans that Ashley Stewart returned to Hot Stitch because they were defective. Moreover, as is clear from Hot Stitch's own Complaint, the Mesrie Affidavit, and the Stacy Haigney email (Ex. E to the Mesrie Affidavit), it is impossible to remove or black out the ASHLEY STEWART® mark from the jeans. Allowing the jeans to be sold to third party competitors would therefore cause substantial harm to Ashley Stewart.

  I declare under the penalty of perjury that the foregoing is true and correct.

_____<br>Georgia Smith

Dated: July 21, 2008

# EXHIBIT A

**Sammy Mesrie**

From: Sammy Mesrie [smesrie@gmail.com]
Sent: Wednesday, June 11, 2008 5:10 PM
To: 'ESHAPIRO@URBANBRANDS.COM'
Cc: GINA FERNANDEZ (GFERNANDEZ@URBANBRANDS.COM)

DEAR ETHAN

I AM COMING FORWARD WITH ALL THE INFORMATION THAT YOU NEEDED FROM ME. I JUST FOUND OUT THAT WE SOLD THE GOODS TO ROSS AS WELL, & HAVE GIVEN THE INFO TO GINA.
A HUGE MISTAKE WAS MADE BY OUR CO. I PERSONALLY DID NOT DO IT, BUT I AM READY TO TAKE FULL RESPONSABILITY. MY EX-PARTNER, WHO EFFECTIVELY MADE THE SALE, IS NO LONGER WITH THIS COMPANY. THE PREVIOUS COMPANY (JUST ERNIE) HAS BEEN SELLING ASHLEY'S CANCELATIONS TO THE MARKET SINCE BEFORE WE BECAME PARTNERS.
I CONSIDER MYSELF TO HAVE BEEN A GREAT SUPPORTER OF YOUR COMPANY, YOU COULD ATTEST TO THAT. EVEN UNTIL NOW I HAVE BEEN PRODUCING GOODS FOR YOU UNTIL TODAY.
I DON'T KNOW IF IT WOULD MAKE A DIFFERENCE, BUT BESIDES THAT I HAVE BEEN GOING OUT ON A LIMB WITH YOUR CREDIT, I WAS NOT ABLE TO GET CREDIT MYSELF ON YOUR INVOICES, BUT I CONTINUED WITH THE HARDSHIP.
WE ARE BOTH JEWS & I AM SURE YOU DON'T WANT TO SEE ME GO OUT OF BUSINESS.
I AM WILLING TO MAKE AMMENDS & HOPEFULLY CONTINUE FORWARD AS A PARTNERSHIP LIKE WE HAVE HAD IN THE PAST.
I WOULD REALLY APPRECIATE THE OPPORTUNITY TO SEE YOU IN YOUR OFFICE THIS WEEK.
I LOOK FORWARD TO HEAR BACK FROM YOU
RGDS
SAMMY

# EXHIBIT B

**Sammy Mesrie**

**From:** Sammy Mesrie [smesrie@gmail.com]
**Sent:** Friday, June 20, 2008 2:10 PM
**To:** 'Ethan Shapiro'
**Cc:** 'Mike Abate'
**Subject:** RE: yesterday's meeting

Dear Ethan

My intention in the email was never to go out to prove you were guilty or innocent, I only meant to show what led me to this situation.
Actually, greed was not what led me to sell your goods, but the desesperation I had with my cash flow.
I admit that all along you took delivery & paid for the goods in full & on time. But please understand the finantial hardship I had(mainly unavailability of credit from factor),to be able to survive the crisis.
Regarding fixing the problem, you can tell how straightforward I was with the information I supplied to you & to Mike yesterday.
Again I look forward to meet you & resolve it as amicably as possible

Rgds
sammy

# EXHIBIT C

**Sammy Mesrie**

From: Ethan Shapiro [EShapiro@urbanbrands.com]
Sent: Friday, June 20, 2008 12:42 PM
To: Sammy Mesrie
Cc: Mike Abate; Georgia Smith; Marla Minns; Gina Fernandez; Anita Britt
Subject: RE: yesterday's meeting

Sammy,
When you are ready to admit that we are the innocent party and ordered and paid in good faith, perhaps we can meet. However, since we will not, under any circumstances, be doing future business it seems a waste of time. If you are under the impression that a Marianne merchandise manager had anything to do with this problem, you again and as usual misspeak. Simply put, you did not ship us all the available goods because you were afraid to carry the paper on your own, your absolute right to do so. After that you got greedy and sold our goods, without our release, which you would not ship us at full cost, to competitors at a discount. Simply put Sammy, you are not a partner we want to do business with and we will not do so. You have an obligation to get our goods off the floor of competitors and we have a decision to make whether or not we you sue for damages. It is your call and you must fix the problem now in order that we may put this behind us.

Ethan Shapiro
CEO, Urban Brands, Inc.