UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HOT STITCH, LLC,

                Plaintiff,              Docket No. 08 CV 6296

-against-

ASHLEY STEWART, LTD.,
URBAN BRANDS, INC. and
ETHAN SHAPIRO,

                Defendants,

---

### DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY DECLARATORY ORDER

#### I.    Introduction

Defendants Ashley Stewart, Ltd., Urban Brands, Inc. and Ethan Shapiro submit this memorandum in opposition to Plaintiff Hot Stitch, LLC's motion for an order that, unless Ashley Stewart fully pays, within ten days, for all ASHLEY STEWART branded apparel in Hot Stitch's possession, Hot Stitch is granted a license for the sale of any ASHLEY STEWART branded apparel produced by Hot Stitch and remaining in its possession.

Sometime in the spring of 2008, Hot Stitch, without Ashley Stewart's knowledge or authorization, unlawfully sold denim jeans with the ASHLEY STEWART mark to competitors of Ashley Stewart at a discount. In an attempt to deflect the blame for its wrongful acts, Hot Stitch now alleges that Ashley Stewart somehow tricked Hot Stitch into ordering a large quantity of denim jeans with the ASHLEY STEWART mark, then was unable and unwilling to take delivery of the jeans, leaving Hot Stitch holding the jeans without the ability to sell them to any third parties due to trademark issues. Ashley Stewart never misled Hot Stitch, however. Rather, Hot Stitch, having been fully informed of all material facts, refused to ship available goods to

B3527404.1

available goods to Ashley Stewart when Ashley Stewart needed the merchandise and was willing and able to accept and pay for it. Thereafter, when Ashley Stewart's inventory needs decreased (as Ashley Stewart had warned Hot Stitch would happen), Hot Stitch decided to wrongfully sell the goods to Ashley Stewart's competitors.

Hot Stitch is now asking this Court to order, without a trial, (1) that Ashley Stewart must pay Hot Stitch for all of the ASHLEY STEWART branded goods in Hot Stitch's possession, or (2) Hot Stitch will be granted a license to sell the trademarked jeans to third parties, in violation of Ashley Stewart's trademark rights under the Lanham Act. This Court must deny the first part of Hot Stitch's request because it would essentially be an order to pay money, which is inappropriate for a preliminary injunction. This Court must also deny the second part of Hot Stitch's request, because (1) granting the request would deprive Ashley Stewart of its trademark rights without a trial and cause irreparable harm to Ashley Stewart; (2) Hot Stitch's request is barred by the doctrine of unclean hands; and (3) Hot Stitch has not shown a likelihood of success on the merits.

## II.   Facts

Ashley Stewart owns and operates specialty retail clothing stores that exclusively sell ASHLEY STEWART branded apparel. See Affidavit of Georgia Smith ("Smith Aff.") ¶ 4. This practice enables Ashley Stewart to ensure the quality of goods with the ASHLEY STEWART brand on them and contributes to the exclusivity and appeal of the brand. Id. ¶ 7. Ashley Stewart also operates a website for the same purpose. Id. Ashley Stewart currently has nearly 200 stores located in urban areas across the United States, and last year had sales of over $100 million. Id.

In or around May 2007, Ashley Stewart began using Hot Stitch as a supplier of ASHLEY STEWART branded denim garments. Id. ¶ 5. Ashley Stewart operated by placing purchase

orders with Hot Stitch (and with its other vendors) based on its anticipated needs 120-180 days out from the order. Id. ¶ 6. Traditionally, Ashley Stewart placed very few denim orders from March through May, because Ashley Stewart's denim sales during the summer months are much less than during the rest of the year. Id.

Prior to November 2007, most, but not all, of Ashley Stewart's purchase orders went through a process known as "factoring." Id. ¶ 8. Pursuant to this process, a "factor," which is usually a third-party bank, certifies Ashley Stewart's creditworthiness. Id. Once the factor approves the creditworthiness up to a certain limit, it sends funds to Hot Stitch and assumes Hot Stitch's risk and responsibility for collection and management of receivables. Id. Generally, in its dealings with its vendors, the factor approval process occurs after the goods are manufactured and shipped to the seller in the United States, but before they are shipped to Ashley Stewart. Id. Ashley Stewart did not deviate from this course in its dealings with Hot Stitch. Id.

Pursuant to several purchase orders that Ashley Stewart placed in early October 2007, Hot Stitch had a large quantity of jeans imported into the United States, as was the usual course of dealing between the parties. Id. ¶ 9. The goods arrived in November 2007. Id. At this time, Ashley Stewart learned and informed Hot Stitch that it was not eligible for factor approval because of credit line limitations. Id. After Ashley Stewart informed Hot Stitch of its inability to obtain factor approval, Hot Stitch made the business decision not to ship the entire quantity of goods to Ashley Stewart. Id. Instead, Hot Stitch was willing to ship the goods in increments of $200,000 pursuant to a revolving line of credit. Id. At the time, Ashley Stewart was willing and able to accept and pay for all the goods covered by the orders. Id. ¶ 11. Ashley Stewart's head buyer, Georgia Smith, also warned Hot Stitch that it was taking a risk, because Ashley Stewart's inventory needs would decrease from March through May 2008 due to slow denim sales during

the summer, meaning that Hot Stitch could be left with extra inventory for those months. Id. ¶ 10. Ms. Smith made it clear, however, that orders would pick up again in June as Ashley Stewart prepared for the fall. Id.

Because it did not want to carry the risk, however, Hot Stitch would not ship goods above increments of $200,000.00 (and, later, $300,000.00). Id. ¶ 11. The quantity of goods Hot Stitch offered to ship pursuant to the line of credit was insufficient for Ashley Stewart's inventory needs at the time, but Ashley Stewart accepted this disadvantageous arrangement so that it could obtain at least part of its inventory needs. Id. As a result of Hot Stitch's decisions, Ashley Stewart's sales and business plan suffered, because it did not have sufficient inventory for the winter months. Id.[1] Moreover, around 1,000 of the jeans Hot Stitch did ship had to be returned because they had a defective inseam. Id. These defective jeans make up a portion of the jeans Hot Stitch is now asking this Court for permission to sell. Id.

As Ms. Smith had warned Hot Stitch, from March to May 2008, Ashley Stewart's inventory needs decreased from March through May 2008, then increased beginning in June 2008. Id. ¶ 12. Sometime during March to May 2008, however, Hot Stitch, without Ashley Stewart's knowledge or permission, sold some of the jeans, which were still affixed with the ASHLEY STEWART mark, at a discount to third party competitors, including Burlington Coat Factory ("Burlington") and Ross Department Stores ("Ross"). Id. ¶ 13. Ashley Stewart only found out about the illegal sales in early June by chance, when one of its employees was shopping in Burlington and happened to see the jeans. Id. Ashley Stewart immediately

---

[1] As noted in the Smith Affidavit, as of January 28, 2008, Hot Stitch had 58,840 pairs of jeans remaining to be shipped. Id. ¶ 11. Over the next month, Hot Stitch only shipped 24,120 pairs of jeans to Ashley Stewart. Id. Ms. Smith asked Hot Stitch to hold onto the remaining 34,720 pairs of jeans until June 2008, and placed orders for 8,899 pairs of jeans from March through May 2008 in order to chip away at the inventory. Id. ¶ 12

B3527404.1                                            - 4 -

contacted Hot Stitch's CEO, Samuel Mesrie. Mesrie at first said he was not sure what happened, but later admitted that "[a] huge mistake was made by our co[mpany] . . . . I personally did not do it, but I am ready to take full responsibility . . . . I am willing to make ammends [sic]." Id. Exs. A and B. Mr. Mesrie later admitted that "all along [Ashley Stewart] took delivery [and] paid for the goods in full [and] on time," but that he sold the goods because Hot Stitch was facing cash flow problems. Id. Ex. C.

Ashley Stewart also contacted Burlington and Ross and demanded that they have the items removed from the stores. Id. ¶ 15. Burlington informed Ashley Stewart that Hot Stitch had shown it a "release" by Ashley Stewart purportedly allowing Hot Stitch to sell the goods provided they removed the ASHLEY STEWART mark. Id. Ashley Stewart never provided Hot Stitch any such "release," nor did Hot Stitch remove the ASHLEY STEWART mark from the jeans. Id. Indeed, representations by Mr. Mesrie in his affidavit, along with an email he attaches as Exhibit E to his affidavit, make it clear that the ASHLEY STEWART mark cannot be removed or blacked out from the jeans. Id.

Because the goods were sold without Ashley Stewart's knowledge or authorization, Ashley Stewart was deprived of the opportunity to examine the goods in order to ensure that they met the quality and design standards for goods affixed with the ASHLEY STEWART® mark. Id. ¶ 16. In addition, Burlington and Ross re-sold the goods at prices beneath what Ashley Stewart charges for the same goods in its own stores and website, giving consumers the incentive to by-pass Ashley Stewart stores and purchase the goods at a discount. Id. ¶ 17. Finally, as mentioned above, Ashley Stewart sells its ASHLEY STEWART® brand exclusively through approximately 200 specialty retail clothing stores across the United States and is a trend setter in the plus-sized fashion industry. Id. ¶ 18. The selling of goods with the ASHLEY STEWART®

mark by discount retailers who are often associated with lesser quality goods or discontinued styles hurts the exclusivity of the ASHLEY STEWART® brand. Id.

### III.    Argument

Hot Stitch now is asking this Court for a license to do what it has already done illegally: sell jeans with the ASHLEY STEWART mark to third-party competitors of Ashley Stewart. Hot Stitch's complaint, along with the current motion, is nothing more than an attempt to deflect the blame for Hot Stitch's self-inflicted harm caused by its business decision to not ship all of the jeans to Ashley Stewart during the winter of 2007-2008. This Court should not reward or perpetuate Hot Stitch's illegal behavior and should deny the motion.

**A.    A Party Cannot Obtain Money Damages Via A Preliminary Injunction.**

A party, such as Hot Stitch, may not use a preliminary injunction to obtain monetary damages, which is a remedy at law. In order to obtain preliminary relief, Hot Stitch must demonstrate "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair grounds for litigation and a balance of hardships tipping decidedly in the movant's favor." Andino v. Fischer, No. 08 Civ. 558 (VM), 2008 WL 2190958, at *1 (S.D.N.Y. May 20, 2008). As showing of irreparable harm is the most important requirement, and to meet that requirement a party must show that "the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages." Raghavendra v. Trustees of Columbia University, No. 06 Civ 6841(PAC), 2008 WL 2696226, at *12 (S.D.N.Y. July 7, 2008)

Here, the first part of Hot Stitch's request is that this Court order Ashley Stewart to pay for all the ASHLEY STEWART branded merchandise in Hot Stitch's possession. This request, amounts to a preliminary determination that Hot Stitch is entitled to monetary damages for

breach of contract and is plainly unavailable via a preliminary injunction. See, e.g., Sparaco v. Lawler, Matusky, Skelly Engineers, LLP, 60 F.Supp.2d 247, 258 (S.D.N.Y. 1999) (holding that a plaintiff's request for a mandatory injunction for the payment of royalties "is both inappropriate (as it gives plaintiff the ultimate relief he seeks) and demonstrates that any injury he has suffered can be compensated by money"); see also Sims v. Stuart, 291 F. 707 (S.D.N.Y. 1922) (L. Hand, J.) ("Under the guise of a mandatory injunction I do not see how I can give final relief in advance of answer and trial in such a case . . . . [N]ever, so far as I know, will [equity] take jurisdiction over a legal claim merely to hurry it along by granting final relief at the outset of the cause."). As in the above cases, granting a preliminary order of a monetary payment would give Hot Stitch the ultimate relief it seeks, and shows that the injury Hot Stitch complains of is compensable by monetary damages, meaning there is no irreparable harm. Moreover, to the extent Hot Stitch argues that, unless it receives a monetary award, it will suffer irreparable harm because it will go out of business, Hot Stitch has failed to present any evidence of this claim aside from the self-serving statement of its CEO, Samuel Mesrie. Without any other evidence, any claim of irreparable harm on this ground is purely speculative. See Auto Sunroof of Larchmont, Inc. v. American Sunroof Corp., 639 F. Supp. 1492, 1494 (S.D.N.Y. 1986) (where the plaintiff offered no proof it would be put out of business beyond "the self-serving statement of its President that its business will collapse," the court found that "plaintiff's claim [of irreparable harm] is speculative" and "plaintiff fails to prove that any lost sales would not be compensable in money damages"). This Court must therefore deny the first part of Hot Stitch's request.

**B.     Hot Stitch Is Seeking An Order Which Would Take Away Ashley Stewart's Trademark Rights Without A Trial And Cause Irreparable Harm to Ashley Stewart.**

Hot Stitch's second request, for a court-ordered license to sell ASHLEY STEWART jeans, amounts to nothing more than a bold request to engage in judicially-sanctioned trademark

infringement. Granting Hot Stitch's request would deprive Ashley Stewart of its trademark rights under the Lanham Act without a trial and would cause irreparable harm to Ashley Stewart.

Under the Lanham Act, a court will find a trademark violation where a plaintiff demonstrates (1) that it owns a valid mark; (2) that the defendant has used the mark, without permission, in commerce in connection with the sale of goods; and (3) that such use is likely to cause confusion. See 15 U.S.C. § 1125(a).

Here, it is undisputed that Ashley is the owner of the federally-registered ASHLEY STEWART mark for women's clothing. And by its own admission, Hot Stitch has used and is requesting permission to use the ASHLEY STEWART mark in commerce in connection with the sale of goods. See Finally, as explained below, granting the unauthorized sale of ASHLEY STEWART goods would cause confusion.

In the Second Circuit, where goods are "genuine," likelihood of confusion, and hence a claim for trademark infringement, will not lie. See Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc., 979 F. Supp. 224, 230 (S.D.N.Y. 1997). Goods are not "genuine," however, where the trademark holder has not authorized their sale and therefore has been deprived of its important right to control the quality of the goods sold under its mark. See El Greco Leather Products Co., 806 F. 2d 392, 395 (2d Cir. 1986); Liz Claiborne, 979 F. Supp. 2d at 230 ("Trademarked goods produced by a manufacturer under contract with the trademark owner are not genuine goods until their sale under the mark is authorized by the trademark owner. Thus, if the trademark owner rejects the goods, the manufacturer may not use the mark in reselling the goods to others.").

In short, the jeans that Hot Stitch sold to third parties were not genuine ASHLEY STEWART jeans. They were infringing products bearing the ASHLEY STEWART mark

without Ashley Stewart's consent. Because the jeans were not true ASHLEY STEWART jeans, "any consumer purchasing [them] might therefore be confused as to the[ir] source . . ." By Design PLC v. Ben Elias Industries Corp., 49 U.S.P.Q. 2d 1789, 1792 (S.D.N.Y. 1998) (internal quotations omitted).

The remedy that Hot Stitch requests – an injunction allowing the sale of ASHLEY STEWART goods – would not only amount to judicially approved trademark infringement but is also highly ironic given that equitable relief is typically afforded a party in Ashley Stewart's, not Hot Stitch's, position. See By Design, 49 U.S.P.Q. 2d at 1793.[2] Moreover, granting Hot Stitch's request would unquestionable cause irreparable harm to Ashley Stewart, as the Second Circuit has held that, in the context of a motion for a preliminary injunction for trademark infringement, a showing of likelihood of confusion will establish risk of irreparable harm. See Warner-Lambert Co. v. Northside Development Corp., 86 F.3d 3, 6-8 (2d Cir. 1996); Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 78 (2d Cir. 1988). As discussed above, ASHLEY STEWART jeans are sold exclusively at Ashley's own retail clothing stores throughout the country so that Ashley can maintain its reputation as a trend setter in plus-size fashion. See Smith Aff. ¶¶ 4, 18. The sale of Ashley Stewart jeans at discount retailers, which routinely feature outdated styles and lower quality goods, would harm a reputation that Ashley Stewart has worked hard for years to build, especially since some of the jeans have already been rejected by Ashley Stewart because they are defective. Id. ¶ 18. Granting the license would also deprive Ashley Stewart of the ability to examine all of the jeans for quality control, and would allow Ashley Stewart's competitors to sell Ashley Stewart's jeans at a discount. Id. ¶¶ 16-17. The fact that it is

---

[2] Notably, Hot Stitch has not cited any cases where a court has granted the type of relief it seeks.

impossible to remove or black out the ASHLEY STEWART mark would only compound the harm Ashley Stewart would suffer. Id. ¶ 15.

In sum, Hot Stitch essentially asks this Court to turn a blind eye to the clear-cut fact that it has already infringed Ashley Stewart's trademark rights and, instead, to rubber stamp its continued unlawful use. If the court granted Hot Stitch's request, it would deprive Ashley Stewart of its trademark rights without a trial and cause irreparable harm to Ashley Stewart. Hot Stitch's audacious request must therefore be denied.

### C.     Hot Stitch's Request Is Barred by the Doctrine of Unclean Hands.

Hot Stitch's motion for a license is also barred by the doctrine of unclean hands. In the Second Circuit, "[e]ven if a plaintiff demonstrates both irreparable injury and a likelihood of success on the merits, a court may deny injunctive relief based on the defense of unclean hands where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the issue at hand." Marathon Outdoor, LLC v. Vesconti, 107 F.Supp.2d 355, 361 n.9 (S.D.N.Y. 2000). Here it is undisputed that Hot Stitch previously and knowingly violated Ashley Stewart's trademark rights when it sold the jeans to third parties without Ashley Stewart's knowledge or authorization. See Smith Aff. Exs. A, C. Hot Stitch's conduct, which it knew was inappropriate, was deceptive and in bad faith, especially because Hot Stitch knew that Ashley Stewart's orders would be increasing beginning in June 2008. Id. ¶ 10. Hot Stitch's previous violation of Ashley Stewart's trademark rights also relates to the issue at hand, i.e., whether to grant Hot Stitch a license to further violate Ashley Stewart's trademark rights. Hot Stitch's request for injunctive relief is therefore barred by the doctrine of unclean hands.

### D. Hot Stitch Has Not Shown a Likelihood of Success on the Merits.

Finally, Hot Stitch's motion must be denied because Hot Stitch has not even attempted to show a likelihood of success on the merits beyond stating as much in conclusory fashion. As discussed above, Hot Stitch's complaint is nothing more than an exercise in retroactive finger pointing to shift the blame from Hot Stitch's fully-informed decision to not sell Ashley Stewart all of the available goods when Ashley Stewart was willing and able to accept and pay for them. It is clear that, if any meritorious claims existed for the events surrounding this litigation, they would be Ashley Stewart's against Hot Stitch for trademark infringement.

For example, Hot Stitch alleges in its complaint that "[b]y April 2008 . . . Ashley's orders had slowed to a near halt and Ashley was unable to meet the 45-day payment terms." Complaint ¶ 30. Hot Stitch, however, neglects to mention that Ashley told Hot Stitch in December 2007 or January 2008 its orders would decrease from March through May 2008, then pick back up in June. Moreover, in a June 20, 2008 email, Hot Stitch's CEO admits that "all along [Ashley Stewart] took delivery [and] paid for the goods in full [and] on time." Hot Stitch also brings a common law fraud claim against Ashley Stewart and Shapiro, but nowhere in its Complaint does Hot Stitch come remotely close to alleging any type of fraud with the particularity required by Federal Rule of Civil Procedure 9(b). In sum, it is clear that Hot Stitch's chances of success are slim. Hot Stitch has clearly failed to meet its required showing that it is likely to succeed on the merits, and this Court must therefore deny its motion.

### IV. Conclusion

For the foregoing reasons, defendants ask that this Court deny Hot Stitch's motion in its entirety.

DEFENDANTS ASHLEY STEWART,
LTD., URBAN BRANDS, INC. and
ETHAN SHAPIRO,

By their attorneys,

_____
Matthew J. Wojtkowiak, Esq. (# MW9738)
Fensterstock & Partners LLP
30 Wall Street
New York, NY 10005
212.785.4100

Of Counsel:
Brandon F. White

FOLEY HOAG LLP
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000

July 22, 2008